# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **NATHANIEL HELLMAN,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **No. 1:23-CV-01436-DAE** |
| | § | |
| **AUSTIN COMMUNITY COLLEGE** | § | |
| **DISTRICT,** | § | |
| *Defendant* | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:    THE HONORABLE DAVID A. EZRA
       UNITED STATES SENIOR DISTRICT JUDGE

Before the Court is Defendant Austin Community College District's ("ACC") partial motion to dismiss, Dkt. 12, and all related briefing. After reviewing these filings and the relevant case law, the undersigned recommends that the District Judge **GRANT IN PART** and **DENY IN PART** ACC's motion according to the discussion below.

## I.    BACKGROUND

Plaintiff Nathaniel Hellman is a Black officer in the Austin Community College District Police Department ("the Department"), where he has worked since October 7, 2013. Dkt. 10, at 2-3. In his complaint, Hellman brings three charges under Title VII of the Civil Rights Act of 1964 ("Title VII") based on conduct occurring between 2013 and 2023. 42 U.S.C. § 2000e, et seq.

First, Hellman brings a discrimination claim, alleging that the Department failed to promote him to several available positions, removed him from his preferred shift (C shift, from 10:30 p.m. to 6:30 a.m.), and "steered [him] away" from certain training opportunities on account of his race. Dkt. 10, at 17. Hellman also alleges that he received "racist and xenophobic emails" from members of the Department's leadership. *Id.* In its motion to dismiss, ACC asks this Court to dismiss claims arising out of certain allegedly discriminatory conduct on the grounds that Hellman failed to comply with Title VII's exhaustion requirements. *See* Dkt. 12, at 4-5.

Second, Hellman brings a retaliation claim, alleging that the Department rejected his application for certain promotions because he (a) filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), (b) attended a meeting to discuss "racial and ethnic communication and issues" within the Department, (c) complained about "racial and ethnic email communication" within the Department, and (d) "claim[ed] he was being racially discriminated against" when he was passed over for previous promotions. Dkt. 10, at 19. ACC responds that Hellman has failed to state a retaliation claim. Dkt. 12, at 19-20.

Third, Hellman claims that ACC subjected him to a hostile work environment. Dkt. 10, at 21. Again, ACC responds that Hellman has failed to exhaust administrative remedies with respect to this claim. *See* Dkt. 12, at 6-8. It adds that even if Hellman had exhausted his administrative remedies with respect to the

hostile-work-environment claim, he still has not stated an actionable claim. *See id.* at 16.

## II.     LEGAL STANDARD

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a 12(b)(6) motion may rely on the complaint, its

proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). A court may also consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). But because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint. *Dorsey,* 540 F.3d at 338. "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

### III.    DISCUSSION

#### A.    Administrative Exhaustion

Enacted to "assure equality of employment opportunities," *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974), Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII has a separate antiretaliation provision which prohibits an employer from "discriminat[ing] against" an employee or job applicant because that individual "opposed any practice" made

unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a).

But before filing a Title VII action in court, would-be plaintiffs must first exhaust administrative remedies through filing a charge with the EEOC, among other requirements.[1] 42 U.S.C. § 2000e-5(e)(1), (f)(1); *Fort Bend Cnty., Tex. v. Davis*, 587 U.S. 541, 543-44 (2019). Ordinarily, a complainant must file that charge within 180 days of the allegedly violative conduct. 42 U.S.C. § 2000e-5(e)(1). However, where a complainant has "initially instituted proceedings with a State or local agency with authority to grant or seek relief from [an unlawful employment] practice or to institute criminal proceedings with respect thereto," a complainant may file an EEOC charge within 300 days of the alleged discriminatory conduct *or* within 30 days after receiving notice that the state or local agency has terminated their proceedings, whichever is earliest. *Id.* Accordingly, claims based on conduct occurring before 300 days prior to the charge are typically barred.

The parties do not dispute that Hellman was required to file charges with the EEOC for each of his allegations within 300 days after the alleged discriminatory conduct. *See* Dkt. 12, at 4 (applying a 300-day timely period to plaintiff's EEOC charge). Therefore, the undersigned will apply the 300-day period in this case. *See*

---

[1] In addition to the requirement that an EEOC charge be filed timely, the EEOC must issue the complainant a "right-to-sue" letter within 180 days of the charge's filing. 42 U.S.C. § 2000e-5(f)(1); *Fort Bend Cnty., Tex. v. Davis*, 587 U.S. 541, 545 (2019). A complainant may then sue within 90 days of that notice. 42 U.S.C. § 2000e-5(f)(1); *Fort Bend*, 587 U.S. at 545. Hellman attaches the right-to-sue letters that correspond to each of his EEOC charges, which were issued on August 28, 2023, and November 6, 2023. Dkts. 1-2; 1-3. Plaintiff initiated this suit on November 21, 2023. Dkt. 1. Therefore, Hellman has satisfied the timely-filing and right-to-sue-letter requirements. ACC does not dispute that he has.

*Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ.*, 579 F.3d 546, 549 (5th Cir. 2009) (applying the 300-day statutory period where the parties did not dispute its applicability).

While acts occurring outside the timely period are typically barred, when a claim is based on a continuing pattern of harassment, rather than a discrete instance, the "continuing violation" doctrine may apply to extend the statute of limitations. *See Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009). Plaintiffs alleging hostile work environment—as opposed to plaintiffs alleging discrete violations—are not limited to filing suit based on events within the statutory period because their claims are "'comprised of a series of separate acts that collectively constitute one unlawful employment practice.'" *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (internal quotation marks omitted)). Therefore, courts may consider the entire scope of the claim, including behavior outside the 300-day (or 180-day) window "so long as an[y] act contributing to that hostile environment takes place within the statutory [] period." *Id.* (quoting *Morgan*, 536 U.S. at 105) (alterations in original). To take advantage of the continuing-violation doctrine, plaintiffs must show (1) separate but related acts that (2) create a continuing violation. *Id.* Finally, in considering whether the continuing-violation doctrine applies, the Court must "'honor Title VII's remedial purpose without negating the particular purpose of the filing requirement.'" *Id.* (quoting *Morgan*, 536 U.S. at 121) (internal quotation marks omitted).

Initially, Hellman may not base any claim on several of his allegations because the allegations occurred outside the statutory period. Because Hellman filed his first EEOC charge on November 22, 2022, any actions occurring before January 19, 2022—and that are not part of a continuing violation forming the basis of a hostile-work-environment claim—have not been administratively exhausted. Importantly, discrete acts, such as a failure to promote, may not be used to support a hostile-work-environment claim. *Morgan*, 536 U.S. at 114 (defining "discrete acts" to include "termination, failure to promote, denial of transfer, or refusal to hire," and holding that each such incident "constitutes a separate actionable 'unlawful employment practice'"). Therefore, Hellman has not exhausted administrative remedies with respect to his allegations that he was not selected to an open sergeant position in 2015 or for an open lieutenant position in 2020, and that he was "steered … away" from a "Field Training Officer training and job duty." Dkt. 10, at 4, 5.[2]

The allegations in paragraphs 28-41 and 43-87 of Hellman's first amended complaint, Dkt. 10, do not fall outside the statutory period because they occurred after January 19, 2022. The allegations in paragraph 42, which concern emails sent by the Department Chief in 2012 and 2013,[3] satisfy the continuing-violation doctrine. Dkt. 10, at 7-10. As described above, the continuing-violation doctrine allows courts

---

[2] These allegations and related, supporting ones—which also occurred outside the statutory period—appear in paragraphs 20-22 and 24-26 of Hellman's amended complaint, Dkt. 10.

[3] In his amended complaint, Hellman states that on May 6, 2023, the Department Chief sent an allegedly xenophobic email. Dkt. 10, at 9. However, because the email is referenced in a list of emails sent during 2013, and because Hellman alleges that a copy of the email was sent to him on May 4, 2022, the undersigned concludes that the 2023 date was included in error, and that the email in question was sent in 2013. *Id.* at 7, 9.

to consider behavior outside the statutory period "so long as any act contributing to that hostile environment takes place within the statutory time period." *Stewart*, 586 F.3d at 328 (citing *Morgan*, 536 U.S. at 118). Hellman describes other alleged harassment occurring within the statutory period. For example, Hellman alleges that on October 27, 2023, he learned that the Chief "spoke about a certain unnamed individual officer in the Police Department" whom the Chief believed was "destroying the police department from within"—a comment which Hellman believes referred to him. Dkt. 10, at 12-13. Because this alleged harassment was perpetrated by the same individual in what Hellman describes as the Chief's role in perpetuating a racist culture within the Department, the undersigned finds that the emails are part of a continuing violation sufficiently related to the timely allegations to survive ACC's administrative-exhaustion challenge.[4] *See Stewart*, 586 F.3d at 328. The same is true for the allegations that in December 2020, the Chief sent an email "that discriminated against members of the Chinese government and Chinese agents" (paragraph 23) and that after Hellman attended a December 2020 interview for an open lieutenant position, Hellman received feedback from a lieutenant that the Chief did not like the "Diversity and Equity Poem" that Hellman submitted with his application or when Hellman spoke about diversity and equity in the interviews (paragraph 27). Dkt. 10, at 4-5.

---

[4] The undersigned finds that the related, supporting allegations in paragraphs 18 and 19, describing a 2013 internal memorandum apparently addressing the Chief's emails and Hellman's learning about the emails, are also covered by the continuing-violation doctrine. Dkt. 10, at 3-4.

As for the substance of Hellman's EEOC charges, it is well-established that "the scope of an EEOC complaint should be construed liberally" when "determining whether a plaintiff has exhausted a particular claim." *Jennings v. Towers Watson*, 11 F.4th 335, 342 (5th Cir. 2021) (quoting *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 443 (5th Cir. 2017)). Courts are to "look slightly beyond [the administrative charge's] four corners" and view the scope of the charge "by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* (quoting *Patton*, 874 F.3d at 443). Therefore, "[a] plaintiff is not limited to the facts … expressly stated" in an EEOC charge.[5] *Moore v. Cricket Commc'ns, Inc.*, 764 F. Supp. 2d 853, 859 (S.D. Tex. 2011) (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462 (5th Cir. 1970)). Rather, the proper inquiry is whether the EEOC charge "stated sufficient facts to trigger an EEOC investigation and to put an employer on notice of the existence and nature of the charges." *Stone v. La. Dep't of Revenue*, 590 F. App'x 332, 338 (5th Cir. 2014) (internal quotation marks omitted).

Hellman has filed two EEOC charges. In the first, filed on November 15, 2022, Hellman makes the following allegations: that he was denied three sergeant positions as a result of discriminatory practices in February 2022, that he has been exposed to "systemic racism" in the Department for "several years," that some people in his department were called "monkeys" on account of their race, and that he received copies of emails demonstrating "racist and discriminatory values" from the Chief of

---

[5] ACC itself acknowledges that "[t]he fact that an allegation in Plaintiff's Complaint occurred subsequent to his EEOC charge does not necessarily show that the claim was not exhausted." Dkt. 12, at 10.

the Department. Dkt. 12, at 23. He adds that the Department "has a history of not giving advanced rank hiring opportunities … to employees who are Black." *Id.*

In the second EEOC charge, filed on May 1, 2023, Hellman alleges that the Department refused to promote Hellman to (a) a lieutenant position, instead choosing a white officer; (b) a sergeant position, instead choosing a Black officer with less experience and education than Hellman; and (c) a sergeant position because the Department had received notice at that time of Hellman's November 2022 EEOC charge. *Id.* at 26. Hellman further alleges that the Department refused to change his shift to C shift so that he may attend school as other officers were permitted to do. *Id.* at 27. According to the charge, each of these events occurred between August 15, 2022, and the date of the EEOC charge filing, May 1, 2023.

Liberally construing his EEOC charges, Hellman has alleged facts "like or related to" both his discrimination and hostile-work-environment claims. *Jennings*, 11 F.4th at 342; *Davenport v. Edward D. Jones & Co.*, 891 F.3d 162, 168 (5th Cir. 2018) (citing *Sanchez*, 431 F.2d at 466). Based on Hellman's charges, an EEOC investigation into discrimination would reasonably result from, for example, Hellman's allegations in the charge that he was not chosen for certain promotions on account of his race. Dkt. 12, at 23-24; *see Stone*, 590 F. App'x at 338 (describing the purposes of the EEOC charge to trigger an administrative investigation and put the accused employer on notice); *cf. Wiggins v. Golden Corral Corp.*, 802 F. App'x 812, 814 (5th Cir. 2020) (holding that plaintiff failed to exhaust his failure-to-promote claim where "[t]he failure-to-promote theory did not appear until [plaintiff's] First

Amended Complaint"); *Smithson v. Union Pacific R.R. Co.*, 602 F. Supp. 3d 974, 981 n.4 (W.D. Tex. 2022) (finding that plaintiff did not exhaust his claim based on an allegedly discriminatory furlough when the charge made "no mention" of the furlough). These allegations would also put ACC on notice of Hellman's discrimination claims. *See Stone*, 590 F. App'x at 338.

Likewise, an EEOC investigation into hostile work environment would result from Hellman's allegations regarding "systemic racism" and offensive comments both in emails from the Department Chief—related through the continuing violation doctrine—and calling Black employees "monkeys." Dkt. 12, at 23-24; *see Stone*, 590 F. App'x at 338; *cf. Richardson v. Porter Hedges, LLC*, 22 F. Supp. 3d 661, 667 (S.D. Tex. 2014) (finding that plaintiff had not administratively exhausted hostile-work-environment claim where charge did "not mention any harassment or abuse, such as offensive comments or humiliating conduct"); *Blanchard v. Tulane Univ.*, 636 F. Supp. 3d 642, 654 (E.D. La. 2022) (finding that plaintiff had administratively exhausted his hostile-work-environment claim based in part on allegations of "microaggression and microinequities"). These allegations would also put ACC on notice of Hellman's hostile-work-environment claim. *See Stone*, 590 F. App'x at 338.

Therefore, although any claims based on allegations occurring outside the statutory period are time-barred, the undersigned finds that Hellman has administratively exhausted his discrimination and hostile-work-environment claims based on the timely allegations. ACC's motion to dismiss Hellman's discrimination

and hostile-work-environment claims on the basis that he failed to administratively exhaust them should be denied.

## B.    Failure to State a Claim

ACC argues that Hellman has failed to state a claim of retaliation or hostile work environment under Title VII. Dkt. 12, at 12-20. The undersigned addresses each in turn.

### 1.    *Retaliation*

Title VII proscribes employment discrimination based on race. 42 U.S.C. § 2000e-2(a)(1); *Davis*, 587 U.S. at 543. Title VII also prohibits retaliation against employees who assert rights under the statute. 42 U.S.C. § 2000e-3(a); *Fort Bend*, 587 U.S. at 543. To establish a retaliation claim at the pleading stage, a plaintiff must allege: (1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action. *Besser v. Tex. Gen. Land Off.*, 834 F. App'x 876, 882 (5th Cir. 2020).

In his amended complaint, Hellman claims that (1) he engaged in protected activity by filing the November 2022 EEOC charge, attending a meeting to discuss "racial and ethnic communication and issues within the [ACC] Police Command Staff," complaining about "racial and ethnic email communication," and claiming ACC discriminated against him based on his race when it declined to select him for certain sergeant vacancies. Dkt. 10, at 19. He further claims (2) that the Department took an adverse employment action against him by failing to promote him to multiple

12

open positions, and (3) that the Department refused to promote him "because of his protected activity." *Id.* In its partial motion to dismiss, ACC asserts only that Hellman has failed to allege a causal link "between his reports of discrimination … and his non-selection for the named positions other than conclusory allegations." Dkt. 12, at 20.

Contrary to ACC's arguments, the undersigned finds that Hellman has alleged a causal link. To establish a causal link at the pleading stage, Hellman is "required to allege facts permitting at least an inference of [his] employer's knowledge of [his] protected conduct." *Wright v. Union Pacific R.R. Co.*, 990 F.3d 428, 434 (5th Cir. 2021). Generally, temporal proximity "on the scale of weeks to a few months" is sufficient to establish a causal link. *See Smith v. Kendall*, No. 23-50713, 2024 WL 4442040, at *7 (5th Cir. Oct. 8, 2024) (stating that the Fifth Circuit has often "found temporal proximity on the scale of weeks to a few months sufficient to establish a causal link" and citing cases). Hellman states that he was not promoted to Lieutenant Position #2439 and Sergeant Position #3389 "because of his protected activity." Dkt. 10, at 19. With respect to Sergeant Position #3389, Hellman plausibly alleges that he did not receive the promotion—a fact he became aware of on April 14, 2023—because of the EEOC charge he filed on November 15, 2022. *Id.* at 2, 13. Namely, Hellman alleges that during an interview for the position, the interviewer used a "hostile tone" and engaged in "aggressive questioning" "in response to Plaintiff having filed the [November 2022] EEOC Charge." *Id.* at 13. He also states that a lieutenant in the Department "had met with the ACC Attorneys and provided a statement regarding

13

Plaintiff's EEOC Charge" on February 7, 2023. *Id.* at 13. These allegations are sufficient to permit "at least an inference" that ACC knew of Hellman's protected conduct. *See Wright*, 990 F.3d at 434.

As for Lieutenant Position #2439, for which Hellman applied on August 15, 2022, Hellman shows that he attended a meeting discussing race-based communication issues among police command and sent copies of allegedly discriminatory emails sent by command to ACC trustees on August 9, 2022. Dkt. 10, at 11. Hellman suggests that his attendance at this and/or similar meetings is well-known, alleging that "everyone knew who the Chief was talking about"—that is, everyone knew the Chief was talking about Hellman—when the Chief described an unnamed officer "causing trouble" for the Department during a meeting. *Id.* at 16. Hellman learned he was not selected for the lieutenant position on October 14, 2022. *Id.* at 12. The close temporal proximity of these events is sufficient to permit "at least an inference" that ACC knew of his protected conduct. *See Wright*, 990 F.3d at 434. The undersigned therefore finds that ACC's motion to dismiss Hellman's retaliation claim for failure to allege a causal link is without merit.

2.    *Hostile Work Environment*

Hellman fails to state a hostile-work-environment claim plausible on its face. Where, as here, an employee brings a claim of harassment against a supervisor, there are four elements of a hostile-work-environment claim: (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome harassment; (3) that the harassment was based on race; and (4) that the harassment affected a

"term, condition, or privilege" of employment. *Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003). "To affect a term, condition, or privilege of employment, the harassing conduct 'must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment.'" *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 453 (5th Cir. 2013) (quoting *Aryain v. Wal-Mart Stores of Tex., L.P.*, 534 F.3d 473, 479 (5th Cir. 2008)). When analyzing whether the conduct is sufficiently severe or pervasive, courts "consider the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Arredondo v. Elwood Staffing Servs., Inc.*, 81 F.4th 419, 433 (5th Cir. 2023). For conduct to be sufficiently severe or pervasive, it must be both objectively and subjectively offensive. *Bye v. MGM Resorts Int'l, Inc.*, 49 F.4th 918, 924 (5th Cir. 2022). Finally, "second-hand" harassment, although relevant, is "'less objectionable than harassment directed at the plaintiff.'" *Arredondo*, 81 F.4th 433 (quoting *Johnson v. TCB Constr. Co.*, 334 F. App'x 666, 671 (5th Cir. 2009)).

As addressed above,[6] discrete acts such as a failure to promote may not be used to support a hostile-work-environment claim. *Morgan*, 536 U.S. at 114 (defining "discrete acts" to include "termination, failure to promote, denial of transfer, or refusal to hire," and holding that each such incident "constitutes a separate actionable 'unlawful employment practice'"). In contrast, hostile-work-environment claims are "composed of a series of separate acts that collectively constitute one

---

[6] *See supra* Part III.A.

'unlawful employment practice.'" *Id.* at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). Harassment "'generally takes the form of discriminatory intimidation, ridicule, and insult that rises to the level of hostile and abusive.'" *Ayorinde v. Team Indus. Servs. Inc.*, 121 F.4th 500, 509 (5th Cir. 2024) (quoting *Clark v. City of Alexandria*, 116 F.4th 472, 479 (5th Cir. 2024)); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (holding that Title VII is violated when the workplace is "permeated with discriminatory intimidation, ridicule, and insult … that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" (internal quotation marks and citations omitted)). Thus— taking into account which allegations were properly administratively exhausted—the allegations from Hellman's complaint that could support his hostile-work-environment claim are:

- On December 1, 2013, Hellman learned about "racial and ethnic emails," which were the subject of an August 2013 internal memorandum "advis[ing]" ACC, Dkt. 10, at 3-4;

- In December 2020, the ACC Department Chief sent an email "that discriminated against members of the Chinese government and Chinese agents," *id.* at 4;

- After he attended a December 2020 interview for an open lieutenant position, Hellman received feedback from a lieutenant that the Department Chief did not like the "Diversity and Equity Poem" that Hellman submitted with his

application or when Plaintiff spoke about diversity and equity in the
interviews, *id.* at 5;

- On May 4, 2022, another officer told Hellman that the Department Chief "is a
  racist toward black people and many groups of people, but Austin Community
  College has never done anything to stop him," *id.* at 7;

- Also on May 4, 2022, Hellman received copies of emails where the Department
  Chief made "racist and offensive" comments between June 25, 2012, and June
  8, 2013, *id.*;

- On January 28, 2023, a Department Lieutenant sent an email asking officers
  to "remain vigilant" of a protest held by a Black advocacy group off ACC's
  campus, *id.* at 12-13;

- On February 7, 2023, a Department Lieutenant told Hellman that "she knew
  racism and discrimination is hard to prove" and that "she wished she had
  recorded or taken statements about racist comments back in her troubling days
  working for the ACC District Police Department," *id.* at 13;

- On March 21, 2023, during an interview for an open sergeant position, a
  lieutenant used a "hostile tone," and "aggressive[ly] question[ed]" Hellman
  about his credentials, *id.*;

- On September 4, 2023, Hellman met with a sergeant in the Department who
  "described many of the racist and ethnic communication that [the Chief] has
  communicated within his ACC work email and within the ACC Police
  Department while on duty," *id.* at 14;

- On October 3, 2023, another officer forwarded emails containing "racial and ethnic communication" from the Chief to Hellman and told Hellman that "he believes that [the Chief] has helped spread harmful racial and ethnic culture" in the Department, *id.* at 15;

- In late September and early October 2023, Hellman worked with a sergeant who "allowed [him] to observe many racial and ethnic communications which she saved regarding members of the command staff" and told Hellman that "she believes women and black people have faced discrimination within [the Department], but the college has done nothing about it in the past," *id.*;

- On October 27, 2023, another officer texted Hellman that during the officer's meeting with the Chief, the Chief "spoke about a certain unnamed individual officer in the Police Department, and this unnamed officer was destroying the Police Department from within," and the officer believed the Chief was referring to Hellman, *id.* at 15-16;

- On November 7, 2023, a second officer told Hellman that "everyone knew" the Chief was talking about Hellman when the Chief referenced an "unnamed officer" "causing trouble" for the Department during a meeting, *id.* at 16; and

- On November 10, 2023, yet another officer speculated that the Chief "spoke negatively" about Hellman during a meeting, allegedly "trying to target" Hellman and "turn other staff against" him, *id.* at 16.

The undersigned is unconvinced that the conditions described above are sufficiently "severe or pervasive" as to alter the conditions of Hellman's employment

18

or create an abusive working environment. *See Boh Bros.*, 731 F.3d at 453 (describing the standard for conduct affecting a term, condition, or privilege of employment). First, many of the allegedly harassing comments were not made to Hellman, including the 2013 emails sent before Hellman was hired and comments made to other Department employees who later described to Hellman what *they* perceived as racism within the Department. Not only is this "second-hand" harassment less objectionable than any harassment of Hellman, but it also appears that the conduct at issue occurred in the past, as opposed to during Hellman's tenure. Dkt. 10, at 14-15 (describing other officers' perceptions of past allegedly racist conduct); *see Arredondo*, 81 F.4th at 433. The Chief's alleged comments about an "unnamed officer" "causing trouble" are similarly second-hand. *See* Dkt. 10, at 15-16. Further, any comments made first-hand to Hellman, including the Chief's emails regarding Chinese citizens and a lieutenant's email regarding protests by a Black advocacy group off-campus, do not clearly direct intimidation, ridicule, or insult at Hellman or other members of his protected group. *See* Dkt. 10, at 4, 12-13.

More importantly, it is unclear that any alleged harassment—whether second- or first-hand—has had any effect on the terms, conditions, or privileges of Hellman's employment. Each of the factors courts typically consider in performing this analysis points away from a finding that the employer's behavior was sufficiently severe or pervasive. *See Arredondo*, 81 F.4th at 433 (listing the factors). First, the discriminatory conduct properly considered in support of Hellman's hostile-work-environment claim is not frequent; indeed, much of it did not occur during Hellman's

employment. *See id.* Second, it is not sufficiently severe. *See id.* Of the comments directed at Hellman, stating that someone is "causing trouble" and "destroying the Department" or that interviewers did not appreciate Hellman's diversity and equity poem, while potentially objectionable, do not rise to the required level of severity. *See id.* Third, none of the alleged harassment is physically threatening or humiliating. *See id.* Fourth and finally, Hellman makes no allegations that the conduct had any effect on his work performance. *See id.*

Because Hellman fails to show that the alleged harassment affected a term, condition, or privilege of his employment, the undersigned recommends that ACC's motion to dismiss his hostile-work-environment claim for failure to state a claim be granted.

## IV.    RECOMMENDATION

In accordance with the foregoing discussion, the undersigned **RECOMMENDS** that the District Judge **GRANT IN PART** and **DENY IN PART** ACC's motion to dismiss, Dkt. 12. In particular, the undersigned recommends that the District Judge **DENY** ACC's motion to dismiss Hellman's discrimination and retaliation claims and **GRANT** ACC's motion to dismiss Hellman's hostile-work-environment claim.

The referral to the Magistrate Judge should now be canceled.

## V.    WARNINGS

The parties may file objections to this report and recommendation. A party filing objections must specifically identify those findings or recommendations to

which objections are being made. The District Judge need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 19, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after the party is served with a copy of the report shall bar that party from *de novo* review by the district court of the proposed findings and recommendations in the report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED December 11, 2024.

DUSTIN M. HOWELL
UNITED STATES MAGISTRATE JUDGE